as Jaburek v. Foxx, Secretary of Transportation. Good morning, Your Honor. It's Mark P.K. Fridley, plaintiff. Your Honor, this is a case that deals with the Fair Pay Act, and whether or not Roberta Jaburek would deny fair pay. I think there's no question that she did the work and did work beyond her category as a secretarial employee. The testimony is that beginning in 1995, she received a promotion at one point, then was put back down, but that in 2008, someone came in. It's the FAA that's involved. So can I clarify your theory, at least? You could be saying that the government should just have a broader pay range for people at the GS-6 level, or you could be saying that there's a problem that she wasn't promoted to the GS-11 level, or its eventual equivalent of whatever this D-scale was. Or you could be saying that she was asking for the desk audit so that her actual job could get slotted at the right level, GS-6, 7, 11, whatever level it was. So what are you saying? Number one, I don't think what we are saying is that she asked for a promotion. Had she done that, she could have gone in and applied. What she was really doing... So you're not saying that there's a failure to promote, but if that's the case, then how do we fit the government's structure of the GS pay scales into this discrimination theory? The scales are what they are. I mean, they have a certain range of pay for each classification. But within those pay groups, there are different levels within their pay. Well, that's true, but they don't... Like a GS-6 is never going to get to a point that they're being paid as much as a GS-11. I'm pretty sure. I mean, I haven't looked at the whole set of matrices lately, but there's a lower end and then steps and then a top end. I understand. At this point, I don't know if that was raised, but again, from the plaintiff's standpoint, we're dealing with a woman who worked somewhere, felt she was doing the work all along, and felt she should have been paid more money for that. Did she ask you? She shares that with me, but go ahead. Huh? She shares that idea with me. Thank you. Yeah, go ahead. So I want to also talk about... You finished your line, because I wanted to talk to you about the male analysts in the other states. How do we know they were similarly situated, and where is that information in the record? The information in the record deals with the fact that, first of all, this is the FAA, so we're talking about a category of employees nationwide. We know that the people who were in, I think, Anchorage, and I forget where the other one was, were still categorized as... And the definition is based on what they defined, the type of work being performed by the program. You're talking to male analysts in Alaska specifically? Right. There are two people who were listed as program analysts doing that kind of work. We also know that the two people who were there previous to her were doing the work, and they've all testified that, in fact, she was doing the same work that they were doing, so that both the two prior program analysts, Forrest and Millers, both testified that they were doing work, and the type of work they were doing was the same work being done by Ms. Jaburek, and that she basically stepped in to perform that work. So can I go back to my other point? I thought I was finished, but I'm not. So somehow, something has to happen. She either has to go to the FAA and say, I should be paid the same amount as Maria Miller or Joanne Forrest or whoever this Anchorage person was, I forget, or she had to say, you need to reclassify my job, or she had to say, whether you use the word promote or not, I don't really care, but put me in the GS-13 category. I don't see her saying any of those things. So if your theory is that the FAA, just on its own initiative, should have done this, I'm not sure where that has any basis. Well, the argument is that when she wrote three letters and said, this is the type of work I'm doing, from an employee standpoint, I think she considered that as a request. But she never tells them what her pay grade and job classification are in those letters, and she doesn't add a final sentence to those letters saying, therefore, I think you should pay me more. Your Honor, she never used the mystical word, yes, I want more money. Well, it's pretty easy to say that, isn't it? But she also testified that she had conversations with these people regarding the type of work she was doing and that they said that they would get back to her. I think it's on page 6 of the opinion. That's not precise enough for me. She had conversations regarding the work she was doing. So are you alleging that we would find in the record conversations where she actually asks for, however it gets accomplished, more money through reclassification, through pushing her up to the top of the GS-6 scale, which wouldn't be the same as what Miller's getting anyway. But where do we find that in the record? Your Honor, the answer is what I have is those three times she sent the letters, asked for it, and I do not... There isn't... Look, I have to look here and say, no, she never walked in and said, hey, this is what I'm getting. Pay me more. Pay for it. I think in her mind that's what she meant all along, and I think that was conversations. But I can't say that I have that statement that she put at the end of the letter saying this is it. And the answer is that I think, though, that there's sufficient things here to at least have this go to a jury and let them determine that. Well, like the non-Hispanic employees that she identifies as comparators were not working in the department during the time she alleged she was discriminated against, right? No, they were not. And wasn't there a shortage of people to do the work in the department as compared with the time when the department was fully staffed? And so don't we have to put that in context? But the answer is yes, but up to a point where there still are... So it makes it harder to see who's similarly situated as she, because we do have to take that into account, the circumstances of the job and who was working there at the time. But I think that the people who were there at the time when she was there were getting more money. We know that during that period of time, the two people, Forrest and Miller, were getting the additional pay that she would get and that when they left, she took over their duties. That's what the argument is in terms of the pay. And what step were they, just remind me, were they six like she was? No, they were 11 and 12, I think. Yeah, and the same thing in the Alaska, right? Yes. Yeah, so that's why I was asking that question. I just went back in the record. That's what I thought the situation is. So you don't really have a similarly situated individual. When I look at the national scope of it and what they said the type of duty she is, then I would say that the people in the other areas who were classified higher were performing the same type of work because that's the definition of the type of work they were doing, and she was not compensated for that. And I think that's, you know, I don't have a mystical, magical argument. I think the argument is real simple. I think she was performing the work. The work she was performing was well above what she should have been paid, and she should have been reimbursed or paid for that work that she was doing. But isn't the process that the government uses for that very problem that you identify, which I'm sure happens to other people as well, is this request for a desk audit so somebody can come, a specialist, and then say, oh, gee, you know, this job isn't properly classified. We need to reclassify your job. And, of course, the consequence of the reclassification is more pay. I think at one point she did ask for a desk audit. There's some mention of it, but I'm unclear. But the district court thought that was very vague. She couldn't tell when it was asked for or to whom or just sort of felt the ball had been dropped is how I understood the district court's statement. All I know is I have to go by the record as I see it, and I acknowledge, you know, that's the issue, is she did ask for a desk audit. She talked to the people she had and asked for the additional money. I'm going to withhold for rebuttal. All right, you can save for rebuttal. That's fine. Mr. Heffron. May it please the court, counsel. And Your Honor has asked several questions about the desk audit, so I'd like to address that issue first. She alleges that she requested a desk audit, which although we disagree with, we have to assume that she did for this purpose. But that point is irrelevant anyway. It is not enough to say that she requested a desk audit, but rather that she requested a desk audit, thought she was being paid too less, and thought that was because they were being or because of her gender or national origin. So simply saying, I'd like to get paid more, is not a protected activity under Title VII and does not trigger any retaliation claim. Now the district court properly granted the summary judgment as to the Equal Pay Act because Ms. Jabarik failed to establish that there was a similarly situated male employee doing equal works requiring substantially similar skill, effort, and responsibility in similar working conditions. Wasn't this Anchorage person a man? Yes, Your Honor. There was Joe Dahl in Anchorage. There was Desiree James in Seattle, who's a female. And then an affidavit references Adele Swycheck, but does not provide any more evidence as to him. There's at least one man in the picture. Yes. So we have some thread of evidence that suggests she's not being paid the same amount as a man is for doing the same work. Correct, Your Honor. Joe Dahl in Anchorage. However, there's one very important thing to note, is that the evidence relied upon states on its face that it was last updated in July 2007. The FAA reorganized several offices in September 2007, and Ms. Jabarik only began allegedly working as a program analyst in January 2008. So we have no evidence that any male was performing as a program analyst in January 2008 to January 2011. Further, we also don't know anything else about them besides their location, their name, and their job title. We don't know what their job duties were, their backgrounds, their education, what they were paid, or even their pay grade. That's not indicated in the employee directory that's relied on. We also don't know how long they were employed with the FAA for. So we don't know that Dahl was an 11? No, Your Honor. We do not, Your Honor. As no male employee in the plains of Fort Worth was working as a program analyst during the relevant time period, the district court properly granted summary judgment. The district court also properly granted summary judgment as to the discrimination claims. It's important to note that although it was originally also a failure to promote claim, they are not appealing that issue, as is stated numerous times. She did not suffer an adverse action, and there, once again, is no similarly situated employees. So what really seems to happen is this last of the series of supervisors, Lay, comes along and brings her duties back in line with her job classification. So she's been giving the government a fair amount of free work, you know, during the period when the Displains Office is understaffed and she's covering the same work that Miller and Forrest had done. Well, there are several differences between Miller and Forrest as well. When they were program analysts in the Displains Office, there was a large volume of work in the Displains Office. The FAA reorganized its Great Lakes region and transferred all of those duties to Fort Worth, Texas. One of the Great Lakes states? Evidently, Your Honor. There's only three individuals left in the Displains Office. There's the engineering technical officer, Neal Johnson, Ms. Jabarik, his administrative assistant, and Emily Nichols, who is a contractor. It seems that Ms. Jabarik was performing some of the duties that Miller and Forrest were performing as well, but as engineering technical officer Neal Johnson indicates, she was doing the work that they used to do in the early part of that program. So she's just in this tiny office when she's doing these things, you're saying? Yes, Your Honor. The bulk of that work is being done in Fort Worth, Texas, and actually the remainder work is supposed to be being done by Emily Nichols, the contractor. Removing these minor alterations or these minor duties, which were ancillary to her assigned responsibilities, is a minor alteration and does not constitute an adverse action. To support her gender discrimination claim, she once again points to Joe Dahl, Del Swycheck, and Desiree James, but we don't know anything about what they do. All we know is their alleged title, when they were working in 2007. As such, the district court properly granted summary judgment as to the gender discrimination claim. Likewise, we know nothing about Ms. Miller or Ms. Forres. Joanne Forres did not submit an affidavit in support of the EEOC claim. Now, was it the government's allegation or Secretary Foxx's allegation that the people responsible for her job classification were unaware that she was Latina? That she was a? That she was Hispanic or Latina? Oh, yes, Your Honor. I'm on to national origin now. Yes, Your Honor. None of the supervisors knew she was Hispanic. So that's, of course, not a ground on which they could discriminate on if they were unaware of it, and that is not controverted in the record. There are many differences between Miller and Forres, such as the timing, the supervision, the volume of work, the fact that there was a contractor assigned, and the work history. As such, the national origin discrimination claim was also properly granted summary judgment. I've discussed the retaliation claim, but to brief that again. If you run out of things to say, you can always sit down. Well, then, unless this Court has further questions, we ask that the district court's decision be referred. Thank you. Thank you. Anything further, Mr. Paquet? Yes. Your Honor, it appears that part of it is the recognition, as you said, when Lourdes Lay took over in 2010 and became the supervisor, she recognized and acknowledged, in fact, her secretary testified. She acknowledged that Mr. Burke was, in fact, doing work well beyond what she was supposed to be doing. And then, when that happened, they immediately wrote letters taking the work away, taking the prism away, reacting to it. And the question is, why did they do that? Whether or not they recognized they had a fair pay case and then retaliated against her because of it. In my mind, the actions that were taken at that time demonstrate the recognition that she was getting less pay than she should have done for years and that nothing was done about it, even though she had written those letters saying, I'm doing this work. Okay. Thank you. Thank you very much. Thanks to both counsel. We'll take the case under advisement.